IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CROWN RESOURCES, CORPORATION, | ) ) ) | No. 35199-8-III |
| Appellant, | ) ) | |
| v. | ) ) | |
| STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY; and OKANOGAN HIGHLANDS ALLIANCE, | ) ) ) ) ) | UNPUBLISHED OPINION |
| Respondents. | ) ) | |

SIDDOWAY, J. — Crown Resources Corporation, owner and operator of the

Buckhorn Mine, administratively appealed the terms of a federal and state water

discharge permit issued to it by the Washington State Department of Ecology (Ecology)

in 2014. The 2014 permit renewed a permit Ecology had initially issued in 2007. The

Pollution Control Hearings Board (Board) affirmed the 2014 permit,[1] and the Ferry

County Superior Court denied Crown's petition for judicial review.

---

[1] During the administrative appeal of the 2014 permit, Crown identified several problems with the permit that were acknowledged by Ecology and the intervenor. The problems were corrected by a modified permit issued by Ecology after the hearing, but before the Board issued its decision. The record was supplemented and the Board based its findings, conclusions, and order on the 2014 permit as modified. Distinctions between the original and modified permit are not important to the appeal, so for the most part, we refer to the permit in both its original and modified form as "the 2014 permit."

Crown assigns error to the superior court's order and judgment on grounds that three aspects of the 2014 permit are contrary to law, are unsupported by substantial evidence, or are arbitrary or capricious: (1) its newly imposed and more stringent final water quality effluent limits, (2) interim limits and a 10-month interim compliance period imposed before the final limits would take effect, and (3) a new definition and mapping of a capture zone that Ecology viewed as merely clarifying a capture zone required by the 2007 permit. Crown also contends the court erred in upholding the Board's determination that the effective date of the 2014 permit was not stayed during Crown's appeal to the Board.

Crown has not met its burden of demonstrating that the Board's order is contrary to law, unsupported by substantial evidence, or arbitrary or capricious. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

The parties to the appeal have over 20 years' experience with the proposed, and ultimately developed, Buckhorn Mine. Crown discovered the gold deposit in the Okanogan Highlands in 1988. The mine property is forested and surrounded by national forest. The mine was originally proposed to be an open pit mine, by a joint venture to which Crown was a party.

Okanogan Highlands Alliance (OHA), a public interest, not-for-profit organization, was formed in 1992 by people living downstream from the mine property, in response to the open pit mine proposal. An environmental impact statement (EIS) was

2

completed on that proposal in 1997. In 2000, in a challenge brought by OHA and others, the Board reversed a number of Ecology's water right determinations and a Clean Water Act (CWA), 33 U.S.C. § 1341, certification it had issued for the open pit mine. *Okanogan Highlands Alliance v. Dep't of Ecology*, PCHB Nos. 97-146, -182, -183, -186, 99-019 (Jan. 19, 2000), 2000 WL 46743.

Crown acquired control of the property and, in February 2004, proposed the present underground mine. As proposed and developed, the mine project area consists of approximately 46 acres of private land. Most of the mine workings are below the water table and must be dewatered to enable mining. The mine's belowground facilities include shafts and sumps. Its aboveground facilities include a mine water treatment plant, an access road, maintenance shops, ore and development rock stockpiles, and detention ponds. Dewatering wells, monitoring wells, surface water monitoring stations, and piezometers surround the mine.

A supplemental environmental review was completed on the underground mine in 2006. The resulting final supplemental EIS (FSEIS) is the foundational environmental document for the current mine. The FSEIS necessarily examined potential water quality impacts of the underground mine and proposed and recommended mitigation measures to address the impacts, concluding that "[w]hile there is a potential that water quality could become degraded, these potential impacts are considered avoidable with the proposed and recommended mitigation measures." Administrative Record (AR) at 3331 (§ 3.17.7),

3160 (§ 3.7-72). The FSEIS contemplated that water quality monitoring would occur during construction, operations, reclamation, closure, and post-closure—until conditions have stabilized below permit limits or water quality criteria. It provided that the treatment plant would continue to operate until water quality standards were met.

On November 1, 2007, Ecology issued to Crown an initial "National Pollutant Discharge Elimination System" (NPDES) and "State Waste Discharge Permit" (2007 permit) under state and federal water quality law.[2] The permit authorized the discharge of treated mine water and stormwater to four outfalls (Outfalls 001, 002, 003 and 004) subject to compliance with specified effluent limits. It also authorized discharges of stormwater from industrial areas, undisturbed areas, and nonindustrial areas collected in identified storm water retention ponds, detention ponds, and infiltration trenches to

---

[2] Washington's "Water Pollution Control Act," chapter 90.48 RCW, was enacted in 1945 and gave Ecology the responsibility and jurisdiction to control and prevent the pollution of waters of the state. RCW 90.48.030. Later amendments to the act make it unlawful for any person conducting a commercial or industrial operation of any type to dispose of solid or liquid waste material into the waters of the state without obtaining a state waste discharge permit. RCW 90.48.160.

The federal "Water Pollution Control Act," also known as the CWA, makes it unlawful for any person to discharge pollutants from a point source into navigable waters of the United States unless the discharge complies with a NPDES permit. 33 U.S.C. §§ 1311(a), 1342(a), 1362(12). Congress authorized the Environmental Protection Agency (EPA) to delegate the NPDES permit program to states, 33 U.S.C. § 1342(b), and Ecology is designated as the state Water Pollution Control Agency for all purposes of the CWA in Washington. RCW 90.48.260.

Ecology regulates water quality under both state and federal law primarily through the use of combined NPDES and state waste discharge permits, such as those at issue in this case.

Outfall 002, where it, too, was subject to compliance with specified effluent limits. The effluent limits for the end-of-pipe discharges were set at levels equal to State surface and groundwater quality standards.

The 2007 permit required Crown to "establish and maintain a ground water capture zone to include all underground mine workings, the surge pond, and all surface stockpiles of ore and development rock." AR at 2028. The 2007 permit also required Crown to monitor water quality at identified monitoring wells, surface waters, and seeps and springs outside the capture zone. AR at 2025, 2032-35, Conditions S2.B5, S2.C. The 2007 permit provided a narrative description of the capture zone but did not include a capture zone definition or boundary map. It also did not set numeric compliance limits for the monitoring locations outside the capture zone. Ecology used monitoring data to determine if the required capture zone was being maintained, however.

OHA appealed the 2007 permit but settled its appeal within a matter of months, agreeing that the mine would proceed, but would provide funding that OHA could use (among other things) to monitor the environmental impacts of the mine.

*Permit violations and settlement agreement.* Over the first five years of mine operation, and beginning in July 2008, Ecology issued Crown six notices of violation, two civil penalties, six administrative orders, and one order amendment. Permit violations included exceedances of effluent limits for the treatment plant, failure to maintain the groundwater capture zone, failure to complete required sampling, and

5

creating slope instability resulting in landslides. Among Crown's disagreements with Ecology's enforcement actions was Crown's denial that it had failed to maintain the capture zone.

In July 2012, Ecology issued Crown a $395,000 civil penalty for allegedly causing a substantial landslide, failing to maintain the capture zone, and discharging water through an electrical control box. Crown appealed the civil penalty. The 2007 permit was only months away from expiring and, in contemplation of its renewal, Ecology and Crown created a process for developing the permit that would eventually be issued in 2014. A technical team was formed and tasked with developing terms of a new permit, and a policy team was formed to focus on settling the penalty and bringing Crown into compliance with the terms of its NPDES permit. The technical team, which included staff from Crown and Ecology, Crown's consultants, and representatives of OHA, met approximately 21 times. The 2007 permit was administratively extended during the period the technical team worked on the new permit.

Crown's appeal of the $395,000 civil penalty was resolved by a "Settlement Agreement" filed with the Board on July 1, 2013. The Settlement Agreement released Crown from liability under the notice of penalty and Crown agreed, among other things, to undertake significant investigation and remedial measures during 2013 and 2014, referred to in the Settlement Agreement as the "Water Quality Protection Program." Terms of a renewed permit were still under discussion, and the Settlement Agreement

6

reflected the parties' understanding that future permit terms would be more stringent,

stating:

> The Parties anticipate that the new NPDES Permit will include more stringent effluent limits, capture zone standards and discharge requirements, and that these new standards, particularly background based groundwater standards, have the potential to put Crown into immediate noncompliance when the new permit is issued. The parties agree that the new NPDES permit will contain interim compliance levels and a timeframe in which to bring the Buckhorn Mountain Site into compliance with these new permit terms.

AR at 1428.

*The 2014 permit and appeal.* On February 27, 2014, after receiving public

comment on the draft permit, Ecology issued Crown a NPDES and waste discharge

permit for the five-year term of March 1, 2014, through February 28, 2019. The

accompanying permit fact sheet described a number of changes from the terms and

conditions of the 2007 permit. Major changes included (1) the addition of a capture zone

definition and map, and specific compliance points for testing whether the capture zone

was being maintained, (2) interim numeric water quality limits that carried forward the

2007 permit's water quality criteria-based compliance limits for 10 months (through the

end of calendar year 2014), and (3) more stringent final numeric effluent limits for

compliance points outside the capture zone. The more stringent final limits were based

on a statistical analysis of background (pre-mining) water quality, instead of the State

water quality criteria-based limits used in the 2007 permit.

7

Crown immediately appealed the 2014 permit to the Board. OHA intervened. The Board held a seven-day evidentiary hearing beginning on January 26, 2015.

On matters raised in this appeal and discussed in detail below, Crown presented testimony from three consulting experts: hydrogeologist David Banton, hydrogeologist Robert Sterrett, and water permitting and statistical expert Owen Reese. Crown also presented testimony from its mine general manager Mark Ioli and its environmental manager, Gina Myers.

Ecology presented the testimony of its Unit Supervisor Sanjay Barik, a geochemist and environmental engineer, who wrote the 2014 permit. Ecology's hydrogeologist for the Crown project, Lorraine Powell, had retired and was unavailable to testify at the hearing, but her deposition was included in the administrative hearing record. OHA presented the testimony of Stephen Swope, a hydrogeologist and expert in statistical evaluation of groundwater data.

Ecology conceded some errors in the 2014 permit that were identified during the seven-day hearing and issued a modified 2014 permit on April 1, 2015. In July 2015, the Board affirmed the 2014 permit as modified in a 46-page findings of fact, conclusions of law and order. It found that Crown had failed to meet its burden of proving the invalidity of any challenged condition. The Board also rejected Crown's contention that the 2014 permit was automatically stayed during pendency of its appeal to the Board. The Board

8

ruled that because Crown did not move for a stay, the terms of the 2014 permit as modified were effective 30 days after it was issued.

Crown petitioned for judicial review of the Board's decision and, in March 2017, following a hearing de novo, the Ferry County Superior Court denied Crown's petition for review and affirmed the Board's findings, conclusions, and order in all respects. Crown appeals. The mine has closed but remains in the reclamation phase.

ANALYSIS

*Standard of Review*

The Washington Administrative Procedure Act (APA), chapter 34.05 RCW, governs judicial review of board orders. *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 587, 90 P.3d 659 (2004); *see* RCW 34.05.514(3). RCW 34.05.570(3) sets forth nine standards for granting relief from an agency order, three of which Crown contends are relevant to this appeal:

> (d) The agency has erroneously interpreted or applied the law;
> (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court . . . ;
> . . . .
> (i) The order is arbitrary or capricious.

Our review of the facts is confined to the record before the Board. RCW 34.05.558; *see Buechel v. Dep't of Ecology*, 125 Wn.2d 196, 202, 884 P.2d 910 (1994) (appellate review is of the board's decision, not the decision of the superior court). "The burden of demonstrating the invalidity of agency action is on the party asserting

invalidity." RCW 34.05.570(1)(a). The court shall grant relief only if it determines that a person seeking judicial relief has been substantially prejudiced by the action complained of. RCW 34.05.570(1)(d).

We review the Board's legal determinations under the "error of law" standard, which allows us to substitute our view of the law for that of the agency. *Verizon Nw., Inc. v. Emp't Sec. Dep't*, 164 Wn.2d 909, 915, 194 P.3d 255 (2008); *Motley-Motley, Inc. v. Pollution Control Hr'gs Bd.*, 127 Wn. App. 62, 72, 110 P.3d 812 (2005). Under this standard, we generally review de novo the agency's application of the law to a particular set of facts. *Port of Seattle*, 151 Wn.2d at 588. When statutory construction is necessary, we interpret statutes de novo but accord substantial weight to the agency's interpretation of an ambiguous statute within its expertise, provided that the interpretation does not conflict with the statute's language or underlying intent. *Id*. at 593; *see also Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't of Ecology*, 146 Wn.2d 778, 790, 51 P.3d 744 (2002).

We review the Board's findings of fact to determine whether they are supported by substantial evidence. *Port of Seattle*, 151 Wn.2d at 588. We view the "evidence and reasonable inferences therefrom in the light most favorable to the party who prevailed at the administrative proceeding below." *Kirby v. Emp't Sec. Dep't*, 185 Wn. App. 706, 713, 342 P.3d 1151 (2014). We do not weigh the credibility of witnesses or substitute

our judgment for that of the Board with regard to findings of fact. *Bowers v. Pollution Control Hr'gs Bd.*, 103 Wn. App. 587, 596, 13 P.3d 1076 (2000).

We may grant relief if the Board's order is "arbitrary or capricious," which is defined as action that "'is willful and unreasoning and taken without regard to the attending facts or circumstances.'" *Port of Seattle*, 151 Wn.2d at 589 (internal quotation marks omitted) (quoting *Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n*, 149 Wn.2d 17, 26, 65 P.3d 319 (2003)). "Where there is room for two opinions, and the agency acted honestly and upon due consideration, this court should not find that an action was arbitrary and capricious, even though this court may have reached the opposite conclusion." *Id.* (citing *Buechel*, 125 Wn.2d at 202).

*Assignments of Error*

Crown assigns no error to any of the Board's 69 findings of fact. Only one of its assignments of error—its challenge to the superior court's order affirming the Board's conclusion that the 2014 permit was not stayed during the appeal to the Board—presents a pure issue of law. Its assignment of error to the court's order affirming the Board on the matters of the final limits, the interim limits and compliance schedule, and the capture zone conditions, require us to review whether the Board's findings of fact fail to support its conclusions.

11

We begin with Crown's challenge to the 2014 permit's definition and mapping of the capture zone because our resolution of the parties' disagreement on that issue bears on other assigned errors.

I.   CROWN DOES NOT MEET ITS BURDEN OF DEMONSTRATING THAT THE 2014 PERMIT'S DEFINITION AND MAPPING OF A CAPTURE ZONE IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE OR IS ARBITRARY OR CAPRICIOUS

The 2014 permit retains the 2007 permit's requirement to maintain a groundwater capture zone, but Ecology sought to clarify the purpose and extent of the zone by including a definition of the term and mapping its boundary.  The now-defined capture zone is described as "represent[ing] the farthest extent from the mine that mine-related contaminants in groundwater and surface water are allowed."  AR at 1115, Condition S1.A.2.  The condition also provides that "[t]he Permittee must capture and treat mine generated contaminated groundwater and industrial stormwater inside the Capture Zone perimeter so that surface and groundwater outside the Capture Zone does not exceed [the permit's effluent] limits."  *Id.*

Crown contends there is no scientific basis for using Ecology's definition and mapping of a boundary on the surface area within which Crown must capture all mine-impacted water.  Review of the FSEIS reveals that there are two possible understandings of the 2007 permit's identification of a capture zone.

The modeling that Ecology used to demark the capture zone boundary in the 2014 permit came from two places: modeling for the FSEIS prepared in connection with the

12

original permitting of the mine and updated modeling following mine operations by Golder Associates, Crown's consultants. The modeling for the FSEIS was prepared by an Ecology contractor, URS, and is contained in a September 2006 report entitled "Regional Three-Dimensional Groundwater Flow Model of Buckhorn Mountain." AR at 3383. Section 5.4.3 of the report explains that "[a]s mining proceeds and groundwater is extracted to dewater bedrock in the mined zone and provide water for consumptive uses, a capture zone will develop around the mine." AR at 3446. It describes the capture zone as

> represent[ing] the surface area over which recharge would be captured by the mine. This is recharge that would either seep into the mine workings or would be extracted using pumping wells.

AR at 3446-47.

URS presumably had in mind a technical, hydrologic concept of a capture zone, discussed hereafter. But its conclusion that development of the capture zone would result in a discernible surface area below which the mine would capture all contaminated water meant that the capture zone it modeled could serve as a regulatory concept as well.

Crown's hydrology expert, David Banton of Golder Associates, Inc., testified that the URS model assumed that any water that did not run off the surface would make its way down and be captured by the dewatering wells in the underground mine. He testified that the assumption that water infiltrating below the surface would make its way vertically to within the footprint of the capture zone did not prove to be true, however.

13

He described the evidence collected through test pits and holes that Golder Associates had drilled during mine operation as "show[ing] that there are these low permeability perching horizons that do direct some water horizontally." Report of Proceedings (RP) at 727. Crown's briefing on appeal describes the FSEIS's modeling of the capture zone as "outdated." Appellant's Br. at 41 n.14.

According to Mr. Banton (and to Robert Sterrett, Crown's hydrogeology expert) the technical hydrology term "capture zone" is not a surface area concept. Mr. Banton described the hydrologic concept of a "capture zone" as

> the point where water would flow to the underground mine sumps or the dewatering wells on one side of the line, and on the other side of the line, the water is moving away, the groundwater within bedrock is moving away to ultimately feed streams or wetlands.

RP at 754. He explained that consistent with the science of hydrology, his capture zone modeling says nothing about surface area, but evaluates only the deep bedrock groundwater system—levels several hundred feet below ground—that would be influenced by the pumping of the mine dewatering wells. He testified it did not include water in the shallow subsurface, or "vadose" zone.

Treating "capture zone" as having this narrow scientific meaning, Crown's staff and consultants view the 2007 permit as not imposing *any* regulation on discharges of contaminated water moving horizontally through the vadose zone. Accordingly, they view the definition and mapping in the 2014 permit as a major change.

14

Ecology's and OHA's representatives in the permitting process had a different understanding of "capture zone" as used in the 2007 permit. Given the assumptions of the FSEIS modeling, the URS report supported using the capture zone it described as a regulatory concept, since it identified the surface area under which all water contaminated by mine operations would be captured and treated. As Ecology points out, the short narrative mention of the capture zone in the 2007 permit describes it as including features located aboveground:

> The Permittee must establish and maintain a ground water capture zone to include all underground mine workings, *the surge pond, and all surface stockpiles of ore and development rock.*

AR at 2028 (emphasis added). And Ecology points out that the 2007 permit cannot be read as leaving discharges of contaminated water that move horizontally through the vadose zone as unregulated. The discharge limitation provision of the 2007 permit states that "[t]he discharge of *any*" identified pollutant at a level in excess of that identified and authorized by the permit constitutes a violation. AR at 2025 (emphasis added). The permit contemplates discharges only at the four outfalls. This is consistent with the intent of the FSEIS that all contaminated mine water would be captured and treated and that water quality impacts from the mine would be "avoided" through mitigation measures. AR at 3331.

Sanjay Barik, the Ecology unit supervisor who wrote the 2014 permit, testified that he understood the new definition of capture zone as entirely consistent with the intent

of the FSEIS. Ecology's former hydrogeologist for the Buckhorn project, Lorraine Powell, shared Mr. Barik's understanding that even under the 2007 permit, Crown was required to capture all contaminated surface or groundwater from any source that is inside the capture zone boundary. This includes vadose zone water, and perched or seasonal water tables.

The Board's findings are mindful of Mr. Banton's opinion that capture zone refers to a cone of depression in the area of vertically moving *deep* groundwater, which would not include water in the vadose zone that moves horizontally and is not affected by dewatering wells.[3] In specifically finding that the capture zone definition in the 2014 permit was supported by substantial evidence, the Board implicitly rejected Mr. Banton's understanding in favor of Mr. Barik's competing explanation that the capture zone was always relied on as a regulatory demarcation extending up to the land surface and encompassing all mine-contaminated water.

Crown nevertheless contends that it proved it is not technically feasible to meet the 2014 capture zone requirement with respect to vadose zone water that travels

---

[3] Crown points to the fact that in section 3.7 of the FSEIS, dealing with "Water Resources," it speaks of the capture zone map as representing a modeled cone of depression created by pumping dewatering wells and sumps at the site, consistent with a hydrologic concept rather than a regulatory concept. Elsewhere in section 3.7 of the FSEIS, however, it specifically contemplates that water seeping from surface stockpiles of ore and development rock and groundwater in the shallow subsurface vadose zone would be captured through additional mitigation measures if needed. For capture purposes, the FSEIS does not differentiate between different types of groundwater, whether shallow or deep, and does not exclude vadose zone water.

horizontally or is "perched" and cannot be captured by dewatering wells. Ecology counters that Crown proved no such thing—it failed to identify any specific area of shallow subsurface water within the capture zone that it is not possible to capture and treat. It points to Mr. Banton's testimony that Crown has installed a shallow dewatering well (SDW-12) and several trenches in order to capture this water, with plans for more. The Board expressly referenced the Banton testimony in its findings, noting Crown's installation of trenches to capture water moving horizontally in the upper layer.

And Mr. Barik opined that Crown can comply with the capture zone as mapped in the 2014 permit. He testified that Crown can capture contaminated groundwater by adding dewatering wells and can capture interflow water in the vadose zone by adding more trenches, as planned by Crown, that hone in on preferential pathways of the water. Ms. Powell testified similarly about measures available or currently in use to capture contaminated water, including stormwater conveyances, placing linings underneath portions of the stockpiles to channel the captured water, dewatering wells, and the mine workings themselves where water is pumped out and processed. She testified that "perched" water is included in the regulatory definition of groundwater that Crown must capture. *See* WAC 173-200-020(12).

Crown's final challenge to the 2014 permit's capture zone mapping is that Ecology drew the line in such a way that some Ecology-approved facilities fall outside the line, placing Crown immediately out of compliance. It argues that this makes the

arbitrariness of the capture zone "particularly evident." Appellant's Br. at 43. But both Mr. Barik and Ms. Powell explained that compliance with the effluent limits is determined at compliance locations, not at monitoring locations around the capture zone. Mr. Barik testified that none of the compliance points fall within the facilities about which Crown expresses concern. In closing argument to the Board, Ecology's counsel reiterated the agency's interpretation and intention to cite only for violations at compliance points and not at monitoring locations.

Crown has not shown as a practical matter that the capture zone boundary, as Ecology interprets and promises to enforce it, is arbitrary or capricious. It has not shown that the Board's affirmance of the 2014 permit's definition and mapping of the capture zone is not supported by substantial evidence.

II. CROWN DOES NOT MEET ITS BURDEN OF DEMONSTRATING THAT THE INTERIM LIMITS AND COMPLIANCE SCHEDULE ARE CONTRARY TO LAW, UNSUPPORTED BY SUBSTANTIAL EVIDENCE, OR ARBITRARY OR CAPRICIOUS

As earlier recounted, the 2007 permit authorized Crown to discharge treated mine water and treated stormwater at four designated outfalls. These "end-of-pipe" discharges from the treatment plant were subject to effluent limits derived from state water quality standards for groundwater and surface water.

The 2007 permit also required Crown to monitor groundwater and surface water quality at designated monitoring wells (MW), dewatering wells, surface monitoring stations, and seeps and springs. Although these were not compliance points, Ecology

used the monitoring results as the basis for determining whether there had been a failure of the capture zone.

The 2014 permit for the first time included numeric compliance limits for surface and groundwater quality at points in the environment outside the capture zone. Because this is the first permit to impose numeric limits at those locations, the 2014 permit provided a 10-month compliance schedule—from March 1 to December 31, 2014— during which interim limits would apply. Mr. Barik testified that Ecology chose the 10-month compliance period to allow for one spring freshet (thaw and runoff period), which he believed would provide Crown enough time to comply with the final limits. With limited exceptions not pertinent to the appeal, the interim limits for the groundwater and surface water monitoring locations carried forward the treatment plant, end-of-pipe, effluent limits from the 2007 permit.[4] In instances where the interim limit would be more stringent than the final limit, the final limit would apply.

WAC 173-201A-510(1) generally provides that waste discharge permits, whether issued pursuant to the NPDES or otherwise, must be conditioned so the discharges authorized will meet the water quality standards. Subsection (4) of the regulation allowed Ecology to issue a schedule for achieving compliance with the chapter's water quality criteria on a case-by-case basis, however, providing that such "[s]chedules . . .

---

[4] Specific locations with high pre-mining levels of arsenic, manganese, and total suspended solids were identified and exempted from compliance with the interim or final limits.

19

shall be developed to ensure final compliance with all water quality-based effluent limits in the shortest practicable time." WAC 173-201A-510(4)(a).[5] The interim effluent limits are required to be formally established, "based on the best professional judgment of the department." WAC 173-201A-510(4)(b).

Crown contends that Ecology did not use its best professional judgment because it failed to consider actual site conditions when setting interim limits that Crown contends are unachievable. It also contends that Ecology failed to consider what time period would be practicable for meeting the new final limits when it established the 10-month compliance schedule.

The site conditions that Crown contends Ecology failed to consider were pre-mining natural background water quality conditions in the environment and the effects of mine activities that Crown characterizes as "previously authorized" by Ecology. Crown's concept of Ecology's "previously authorized" activities is based on its position that before the 2014 permit, its only obligation was to treat for contaminated water located in the narrowly defined hydrology capture zone. We agree with the Board's finding that Ecology reasonably understood the 2007 permit to require *all* contaminated water from mine operations to be collected, treated, and discharged through outfalls subject to the state water quality effluent limits, however. As Ecology points out, any pollution above

---

[5] WAC 173-201A-510 was partially amended in 2016. The parties do not contend the changes are relevant to this appeal. *See* Br. of Appellant at 28 n.10.

20

those limits was not a result of activities authorized by Ecology; it was a result of Crown's permit violations.

Even though Ecology concedes that the capture zone language of the 2007 permit required clarification in the 2014 permit, the 2007 permit clearly required Crown to maintain specified "sampling locations" in both surface and groundwater in the environment. AR at 2032, 2034, Conditions S2.B.5, S2.C. As a matter of logical interpretation of the 2007 permit (and consistent with WAC 173-201A-510(1)'s requirement that permits be conditioned to meet water quality standards), the 2007 permit limits—which are equal to the state water quality standards—applied at the designated sampling locations. Otherwise, there would have been no way to ensure compliance with the capture zone. Ecology consistently interpreted and applied the 2007 permit in this fashion, twice penalizing Crown for capture zone failures.

Ecology also contends that the anti-backsliding provision of the CWA constrained Ecology in setting interim limits. The anti-backsliding provision prohibits permits from being "renewed, reissued, or modified . . . to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit." 33 U.S.C. § 1342(o)(1); *see Port of Seattle*, 151 Wn.2d at 604 ("NPDES permits are subject to an

21

'anti-backsliding' provision, which does not allow a subsequent NPDES permit to create a lesser effluent limitation.").[6]

The 2014 permit's interim limits for compliance points in the environment are, for practical purposes, "comparable [to the] effluent limitations in the previous permit" and, therefore, cannot be less stringent under the CWA's anti-backsliding rule. 33 U.S.C. § 1342(o)(1). *Communities for a Better Environment v. State Water Resources Control Board*, 132 Cal. App. 4th 1313, 1330-31, 34 Cal. Rptr. 3d 396 (Cal. Ct. App. 2005), which Crown cites as holding that the anti-backsliding rule does not apply when a less stringent interim limit is *not comparable* to the final limit in a prior permit, is therefore inapposite.[7]

---

[6] Crown incorrectly contends that Ecology did not raise the CWA anti-backsliding rule below and that it was not part of the Board's decision. Ecology relied on the anti-backsliding rule in its prehearing brief and closing argument. In conclusion of law 2, AR at 1482, the Board's decision referred to the CWA and its prohibition against discharge of any pollutant unless done in compliance with the CWA and/or an NPDES permit. The Board cited to 33 U.S.C. § 1342, which contains the anti-backsliding provision. Thus, the Board's decision comports with the requirement that its decision is supported by rationale in the administrative record. *See Aviation W. Corp. v. Dep't of Labor & Indus.*, 138 Wn.2d 413, 446, 980 P.2d 701 (1999).

[7] Crown argues for the first time in its reply brief that the "new interim limits that Ecology applied to groundwater in the environment are not 'effluent limitations' that govern discharges from point sources to navigable waters, and therefore are not subject to the CWA anti-backsliding provision." Appellant's Reply Br. at 26 n.12. We decline to consider this issue argued for the first time in the reply brief. To address issues argued for the first time in a reply brief is unfair to the respondent and inconsistent with the rules on appeal. *See Ainsworth v. Progressive Cas. Ins. Co.*, 180 Wn. App. 52, 78 n.20, 322

The Board found that the record contains substantial evidence supporting the interim effluent limits. It found that using the 2007 permit's end-of-pipe effluent limits as the basis for the interim limits was not unreasonable and was within Ecology's discretion. The Board's findings support its conclusion that Crown failed to carry its burden of establishing the invalidity of the interim discharge limits, implicitly determining that Crown failed to demonstrate that Ecology did not use its best professional judgment in setting the interim limits. WAC 173-201A-510(1).

The 10-month period for compliance presents a closer question. The Board's findings cite Mr. Barik's testimony that from early 2012, Ecology communicated to Crown that the renewed NPDES permit would include numeric limits for monitoring locations outside the capture zone and a compliance schedule applicable to those limits.[8] It found that for several years, Crown had been aware of existing contaminates related to its prior discharges from the treatment plant as well as elevated sulfate concentrations in MW-14. It found that prior violations had already caused the parties to put in place the Water Quality Protection Program. It found that the July 2013 Settlement Agreement

---

P.3d 6 (2014); RAP 10.3(c) (reply brief should be limited to a response to the issues in the brief to which the reply brief is directed).

[8] In fact, Mr. Barik testified that "Ecology made very clear starting from fall of 2011" that new limits would be based on background water quality, not state water quality criteria, and "it's fair to say that Crown was aware of this position three year[s] ahead of time even before the permit was issued." RP at 1140.

memorialized the parties' understanding that the NPDES permit under discussion would contain interim limits and a compliance schedule.

The Board cited Mr. Barik's testimony that the 10-month period would allow for one more spring freshet to occur, which would provide time for existing contaminants from Crown's previous discharges to flush through the system, and that the 10-month time frame provided sufficient time for the installed improvements to come on line and benefit water quality.

Crown complains that the Board did not make any findings explaining its rejection of its witnesses' testimony that it could not practicably meet the final limits in a 10-month period. But the Board's findings reflect its consideration of Crown's witnesses' testimony that 10 months did not give it sufficient time to realize the intended positive effects of the Water Quality Protection Program. It recognized that Crown proposed that the interim limits remain in effect until July 2017, to allow for three spring freshet periods and provide time to evaluate Crown's compliance with the interim limits after which the parties would discuss whether a permit modification was needed. We can infer from the lack of additional findings that the Board rejected Crown's scientific testimony in favor of Ecology's explanation why the 10-month period was appropriate. *See, e.g.*, *Pilling v. E. & Pac. Enters. Trust*, 41 Wn. App. 158, 165, 702 P.2d 1232 (1985) (absence of finding on a material issue is presumptively a negative finding against the party with the burden of proof).

And Ecology provides extensive argument as to how the record and Crown's own inaction refutes its science-based lack of feasibility claims. It argues that Crown's argument that its "legacy" pollution was authorized by the discharge permissions in the 2007 permit lacks factual or legal support. It points out that Crown did not, as a factual matter, discharge to state water quality levels for most constituents. It gives the example of sulfate, whose treatment plant discharge rate has been below 50 mg/L since June 2009, a level that cannot explain documented sulfate levels above 250 mg/L in Gold Bowl Creek and elsewhere. It also argues that Crown did not provide calculations or specific analysis of the extent or lasting time of its legacy pollution, i.e., it did not document the fate and transport of contaminants historically discharged from the treatment plant.

Crown's experts testified that 10 months was insufficient time to address contamination from its use of construction fill material that is leaching sulfate into the groundwater, but Ecology argues that their claim to need more time is undermined by Crown's own actions, since Crown controlled how it placed the construction fill, the type of fill used, and how quickly it responded to its discovery in 2010 that the fill was contributing to significant groundwater pollution.

It appears that the Board agreed with Ecology that Crown should not receive regulatory cover through an extended compliance schedule for what Ecology calls Crown's poor compliance record and inadequate attempts at adaptive management.

Based on the competing evidence, reasonable minds could differ on whether the 10-month period is too short. "Where there is room for two opinions, and the agency acted honestly and upon due consideration, this court should not find that an action was arbitrary and capricious, even though this court may have reached the opposite conclusion." *Port of Seattle*, 151 Wn.2d at 589.

III. WE WILL NOT CONSIDER CROWN'S UNPRESERVED CHALLENGE TO AN ALLEGED FAILURE BY ECOLOGY TO CONDUCT AN AKART ANALYSIS; CROWN DOES NOT DEMONSTRATE THAT THE FINAL LIMITS ARE CONTRARY TO LAW, UNSUPPORTED BY SUBSTANTIAL EVIDENCE, OR ARBITRARY OR CAPRICIOUS

As documented in the FSEIS, the background water quality for ground and surface water at Buckhorn generally exceeds the numeric criteria in State water quality standards. Although Ecology did not use background water quality as the basis for the effluent limits in the 2007 permit, it chose background water quality as the basis for the final effluent limits in the 2014 permit in order to be consistent with the state antidegradation policy as expressed in RCW 90.54.020(3)(b) and to ensure Crown's maintenance of the capture zone.

RCW 90.54.020 provides a "general declaration of fundamentals" that shall guide utilization and management of the waters of the State. It declares an antidegradation policy:

> (3) The quality of the natural environment shall be protected and, where possible, enhanced as follows:
> . . . .
> (b) Waters of the state shall be of high quality. Regardless of the

26

> quality of the waters of the state, all wastes and other materials and substances proposed for entry into said waters shall be provided with all known, available, and reasonable methods of treatment prior to entry. *Notwithstanding that standards of quality established for the waters of the state would not be violated, wastes and other materials and substances shall not be allowed to enter such waters which will reduce the existing quality thereof, except in those situations where it is clear that overriding considerations of the public interest will be served.*

RCW 90.54.020 (emphasis added). Ecology's regulations repeat and implement this policy, providing that where background water quality exceeds the numeric standards listed in Ecology's regulations, no measurable change may be allowed to water quality without a specific finding that lowering the water quality is necessary and in the overriding public interest. WAC 173-200-030(2)(c) (groundwater); WAC 173-201A-320(1) (surface water).

The final effluent limits in the 2014 permit are based on a statistical analysis of a pre-mining background water quality data set gathered at Buckhorn Mountain during the EIS development process from 1990 through 2007. Stephen Swope, OHA's hydrogeologist and expert in statistical analysis for groundwater data, performed the analysis, relying on Ecology and EPA guidance documents.

Crown maintains that Ecology's regulations and formal guidance establish a two-step process Ecology must follow in establishing limits when the existing water quality is better than State water quality criteria. It argues that both steps were violated in setting the final limits in the 2014 permit. It describes the first step as properly determining

27

existing background water quality and the second step as establishing an enforcement limit somewhere between background and the State criteria based on an "AKART" evaluation of what water quality can be practicably and reasonably achieved. "'AKART' is an acronym for 'all known, available, and reasonable methods of prevention, control, and treatment.'" WAC 173-201A-020.[9] Crown argues that at step one, Ecology used inappropriate background values. It argues that Ecology simply ignored step two by failing to conduct an AKART analysis evaluating what water quality levels could be practicably or reasonably achieved.

> A. Crown's argument that Ecology failed to perform an AKART analysis is raised for the first time on appeal and will not be considered

We turn to the second contention first because Ecology and OHA object that an alleged failure by Ecology to perform an AKART analysis is improperly raised for the first time on appeal. RCW 34.05.554 generally provides that issues not raised before the agency may not be raised on appeal. *Bowers*, 103 Wn. App. at 597-98 ("RCW 34.05.554 precludes appellate review of issues not raised below."). Our own rules also require issue preservation. RAP 2.5(a). Crown responds that it *did* raise the issue before the Board, but since the Board did not address the issue in its otherwise thorough decision, we have our doubts and turn to the record.

___

[9] WAC 173-201A-020 goes on to provide that "AKART shall represent the most current methodology that can be reasonably required for preventing, controlling, or abating the pollutants associated with a discharge. The concept of AKART applies to both point and nonpoint sources of pollution."

Crown's allegedly new argument is that "Ecology must . . . set limits 'as near the natural groundwater quality *as practical*,'" and, "In determining what limits are practical to achieve, Ecology must undertake an 'AKART' analysis." Appellant's Br. at 15 (quoting WAC 173-200-050(3)(a)(ii)) (alteration in original). But Crown's "Proposed Legal Issues and List of Witnesses and Exhibits" filed with the Board did not identify as an issue any alleged failure by Ecology to comply with WAC 173-200-050(3)(a)(ii) or an alleged failure to perform an AKART analysis. *See* AR at 363-69. The Board's "Prehearing Order" identifies issues "submitted and agreed to" by the parties, "which will govern the case," and does not identify an alleged failure by Ecology to comply with WAC 173-200-050(3)(a)(ii) or prepare an AKART analysis. *See* AR at 378-80. Neither AKART nor the second step of an asserted two-step process is addressed in Crown's prehearing brief. *See* AR at 914-29. Crown *did* argue in its prehearing brief that Ecology used the background values themselves as enforcement values, not as a base on which to determine enforcement values, AR at 922, but it did not identify any regulation or guidance that it contended was required but not followed.

In reply to Ecology's and OHA's contention that this issue was waived, Crown cites testimony or argument appearing in 9 pages of the 1,382-page transcript of proceedings. Appellant's Reply Br. at 12. Only the testimony of Owen Reese, Crown's consulting water resources engineer, merits discussion. Read as a whole, it is clear that Mr. Reese did not assert that Ecology failed to follow any particular required procedure

in setting the final limits in the 2014 permit. He merely observes that the 2014 permit is atypical because the enforcement limit imposed is the same as background water quality.

Mr. Reese appears implicitly to concede that performing an AKART analysis is the responsibility of the permittee, not the Department of Ecology,[10] something that Ecology points out is the position taken in its "Implementation Guidance for the Ground Water Quality Standards." *See* AR at 2729, 2795 & 2799 ("The permittee must complete an AKART evaluation.") and 2796 ("The permittee should describe all possible treatment technology alternatives, including the effective treatment levels and the costs associated with each technology."). And in response to questioning by two Board members, Mr. Reese concedes that an AKART analysis can support treating background water quality as the enforcement limit, although more typically it will not. The final questioning by Board members makes it clear that Mr. Reese did not claim that AKART would have required a higher enforcement limit in this case:

> Q.  [By Board member Tom Morrill]  And is that part of your comment or a determination that AKART can't get you to background?
> A.  I haven't done an AKART determination, unfortunately.
> Q.  So your questioning about having those limits set at background is just—*that's not how you would normally see it, but it's not based on specific issues with the site?*
> A.  That's correct.
> Q.  That's all.  Thank you.

---

[10] Q.  And is that a part of your comment or a determination that AKART can't get you to background?
A.  *I haven't done an AKART determination, unfortunately.*
RP at 904 (emphasis added).

BOARD EXAMINATION
BY PRESIDING BOARD MEMBER JOAN MARCHIORO

Q.  Just so I'm clear, Mr. Morrill asked you questions about setting of using background, and I thought I heard you first say you should— and using the word never is not very helpful—you should not set the enforcement limit at background, and then you later said that if AKART gets you to background, then you can use background as the enforcement limit.  Or did I misunderstand?

A.  No, I think you're right.  I think my later statement is more correct, that if AKART and if the technologies can get you to background, then the enforcement limit would be there.

AR at 904-05 (emphasis added).

Ecology and OHA have major disagreements with Crown over Crown's interpretation of the language "as practical" appearing in WAC 173-200-050(3)(a)(ii), the relationship between AKART and the antidegradation policy, and who—Ecology or the permittee—is responsible for undertaking any AKART analysis.  None of these disagreements were presented to or resolved by the Board.  Witnesses were not questioned about how these issues, correctly resolved, would apply to the 2014 permit.  We will not consider Crown's contention for the first time on appeal that by failing to undertake an AKART analysis, Ecology failed to comply with WAC 173-200-050(3)(a)(ii).

B.  Crown does not meet its burden of demonstrating that background values were determined contrary to law, were unsupported by substantial evidence, or are arbitrary or capricious

Crown did present and preserve the argument that Ecology erred in the initial step of determining background water quality conditions by using an incorrect statistical

31

analysis that deviated from its regulations and Implementation Guidance. Ecology's

Implementation Guidance[11] explains that the statistical analysis for background water

quality will differ depending upon whether the data set is parametric (normal distribution)

or nonparametric (i.e., does not follow a normal bell curve). The parties agree that in this

case, the data is nonparametric because it was collected from several locations over

different time periods.

The Implementation Guidance states generally that background water quality "is

statistically defined as the 95 percent upper tolerance interval with a 95% confidence."

AR at 2803 (emphasis omitted). It also provides, however, that in cases of nonparametric

data, the maximum value in the data set is used as the upper tolerance limit and defines

background water quality. Despite this, Ecology, relying on Mr. Swope's work, used the

95 percent upper tolerance interval with 95 percent tolerance. Crown argues that by

using this measure rather than the maximum value as the upper tolerance limit, Ecology

---

[11] Ecology developed its earlier-mentioned Implementation Guidance as an advisory and interpretative statement for implementing chapter 173-200 WAC for activities, such as mines, that are required to receive a State waste discharge permit. The Implementation Guidance document states that it is not a regulation, but is intended as a general guide to facilitate consistent statewide issuance of permits. It is not intended to be inclusive or address every circumstance at every facility. The specific requirements will depend on each facility and its unique situation. *See* RCW 34.05.230(1); *Wash. Educ. Ass'n v. Pub. Disclosure Comm'n*, 150 Wn.2d 612, 619, 80 P.3d 608 (2003) (interpretive statement has no legal or regulatory effect).

has "essentially guarantee[d] a 5% false positive rate, even if there were no mining-related impacts." Appellant's Reply Br. at 15.

Mr. Swope explained his seeming disregard of the Implementation Guidance. He testified that the narrative in the Implementation Guidance on which Crown relies applies to data sets with 59 or fewer samples, which was the expected norm at the time the narrative was prepared. If a data set has more than 59 samples, then the highest value does not have to be used to achieve a 95 percent coverage. The data set used by Mr. Swope had significantly more than 59 samples. Mr. Swope further testified that the 95 percent upper tolerance interval with a 95 percent confidence method is used throughout the industry and its use is consistent with Ecology's and EPA's guidance. As the Board found, even Crown's expert, Mr. Reese, agreed that the method is commonly used to calculate background. Beyond being scientifically acceptable, it has the advantage of balancing the risk of false positives and false negatives.

The Board found that the record contains ample evidence supporting the final limits and that Crown did not meet its burden of proving that the methodology employed to derive the final effluent limits was inappropriate. It found that while Ecology recognized the potential for false positives, "it appropriately balanced that risk against the risk of false negatives." AR at 1478-79.

IV. THE SUPERIOR COURT PROPERLY AFFIRMED THE BOARD'S CONCLUSION THAT THE EFFECTIVENESS OF THE 2014 PERMIT WAS NOT STAYED DURING THE BOARD APPEAL

Finally, Crown contends that the effective date of the 2014 permit was automatically stayed under RCW 34.05.422(3) during the pendency of its appeal to the Board. The Board concluded that under that statute, the 2014 permit took effect on the last day to file an appeal with the Board—which was 30 days after issuance—and in order to obtain a stay beyond that point, Crown needed to file a motion for stay with the Board. The superior court affirmed the Board's decision that because Crown did not file a motion for stay, the terms of the modified 2014 permit were effective 30 days after its issuance.

At issue is statutory interpretation, which we review de novo. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). The fundamental purpose in statutory interpretation is to ascertain and discern the legislature's intent. *Id.* We discern legislative intent from the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole. *Id.* at 9-11. If the meaning of the statute is plain on its face, then we must give effect to that meaning as an expression of legislative intent. *Id.* at 9-10.

We find no conflict between the provisions of the APA and chapter 43.21B RCW, which created the "Environmental and Land Use Hearings Office" and prescribes the jurisdiction of the Board, its membership, and many of its procedures.

RCW 34.05.422(3), the APA provision relied on by Crown, states:

When a licensee has made timely and sufficient application for the renewal of a license or a new license with reference to any activity of a continuing nature, an existing full, temporary, or provisional license does not expire until the application has been finally determined by the agency, and, in case the application is denied or the terms of the new license limited, until the last day for seeking review of the agency order or a later date fixed by order of the reviewing court.

The statute's provision that "an existing . . . license does not expire until the application has been finally determined by [Ecology]" had application in this case, when Ecology administratively extended Crown's 2007 permit until its application for a new license was finally determined on February 27, 2014. The Board has recognized the application of RCW 34.05.422(3) in this context. *E.g.*, *Ellensburg Water Co. v. Dep't of Ecology*, PCHB no. 86-153, 1990 WL 151750 at \*6 (Feb. 2, 1990); *Okanogan Highlands Alliance v. Dep't of Ecology*, PCHB no. 04-064, 2005 WL 878023 at \*7 (Apr. 12, 2005).

Crown argues that the last clause of RCW 34.05.422(3) also applies because the terms of its original 2014 permit applied to activity of a continuing nature and in issuing the permit, Ecology imposed terms that were more limiting than the terms of its prior, 2007 permit. We accept that proposition. As applied to Crown, its then-existing 2007 permit did "not expire . . . until the last day for seeking review of the [Ecology] order."

35

*See* RCW 34.05.422(3). Consistent with this clause, the Board held that the 2007 permit did not expire until the last day for seeking Board review of Ecology's issuance of the 2014 permit.

Crown seemingly argues that because Ecology and the Board are both agencies, we should read RCW 34.05.422(3) as applied in this case as if the term "agency" means "Ecology" the first time "agency" is used in the statute, and means "Board" the second time "agency" is used, with the result that its 2007 permit would not expire "until the last day for seeking review of the [*Board*] order." *See* RCW 34.05.422(3). That is not how we construe the same word used in a single statute, however. *E.g.*, *State v. Gonzalez*, 168 Wn.2d 256, 264, 226 P.3d 131 (2010) (When similar words are used in different parts of a statute, the meaning is presumed to be the same throughout.). Yet, Crown argues that only by reading the second use of the word "agency," as meaning "Board," can we avoid rendering meaningless the language that follows: "or a later date fixed by order of the reviewing court." *See* RCW 34.05.422(3).

Crown overlooks a critical fact: administrative appeals to a second agency are not the norm under the APA, and the APA does not undertake to address the different procedures that apply in the atypical case where an administrative appeal to a second agency is required. The APA contemplates only stages of review within a single agency or judicial review. Under the stand-alone application of the APA, RCW 34.05.422(3)'s reference to an order of the reviewing court makes sense. What makes *no* sense is to

36

construe the APA to provide that in the case of all other permits and licenses, limitations in a newly limited permit or license would be suspended for the short period of time within which to obtain judicial review, but limitations in a newly limited permit issued by Ecology would be suspended for what might be a one-year long, or longer, proceeding before the Board.

Administrative review of Ecology decisions by the Board is addressed first and foremost by chapter 43.21B RCW. RCW 43.21B.010 provides that the "purpose of the pollution control hearings board is to provide for a more expeditious and efficient disposition of designated environmental appeals as provided for in RCW 43.21B.110." Members of the Board are required under RCW 43.21B.020 to be "qualified by experience or training in pertinent matters pertaining to the environment." They acquire additional expertise in performing their statutory duties. *Dioxin/Organochlorine Ctr. v. Dep't of Ecology*, 119 Wn.2d 761, 776, 837 P.2d 1007 (1992).

The APA provides that "[n]othing in this chapter may be held . . . to limit or repeal additional requirements imposed by statute." RCW 34.05.020. The Board applied RCW 43.21B.310(2), which provides that "[a]t any time during the pendency of an appeal of . . . an order to the board, the appellant may apply pursuant to RCW 43.21B.320 to the hearings board for a stay of the order," and RCW 43.21B.320(1), which provides that a person appealing an order that has not been stayed by the issuing agency "may obtain a stay of the effectiveness of that order *only* as set forth in this

37

section."  (Emphasis added.)  A prima facie case for stay is made "if the applicant demonstrates either a likelihood of success on the merits of the appeal or irreparable harm."  RCW 43.21B.320(3).  Crown did not move for a stay in the manner required by RCW 43.21B.320.  The Board refused to treat the 2014 permit as stayed.

This would appear to be required by the plain language of the provision, but Crown argues that the plain meaning of "order" as used in RCW 43.21B.310 and .320 does not include licenses and permits—Crown even argues that provisions of chapter 43.21B RCW "repeatedly distinguish" between "orders" on the one hand, and "permits or licenses" on the other.  Appellant's Reply Br. at 35.  We disagree.  The APA defines the unqualified term "order" as meaning "a written statement of particular applicability that finally determines the legal rights, duties, privileges, immunities, or other legal interests of a specific person or persons."  RCW 34.05.010(11)(a).  A license or permit is plainly "a written statement of particular applicability that finally determines the legal . . . privileges . . . of a specific person or persons."  *Id.*  Indeed, it is hard to imagine calling an order that determines someone's "legal . . . privileges" anything other than a license or permit.

And RCW 43.21B.110 does not repeatedly distinguish between orders and licenses.  It favors the generic "decisions" in describing matters that the Board has jurisdiction to hear and decide.  It only uses the term "orders" in identifying particular orders, under specific statutes, that fall within its appellate jurisdiction.

38

RCW 43.21B.110(1)(b), (j). While RCW 43.21B.230(3)(c) speaks of an "order, permit, license, or decision" being appealed, that reference alone does not justify treating the four terms as mutually exclusive. "License" means and includes a "permit" under the APA. RCW 34.05.010(9)(a). And rather than treat "decision" as excluding an order, permit, or license, RCW 43.21B.110 treats "decision" as all-encompassing. Just as a permit is a license and orders, permits, and licenses are decisions, a permit is an order. *And see Dioxin/Organochlorine Ctr.*, 119 Wn.2d at 777 n.59 (holding that the appellant was required to appeal Ecology's NPDES decision to the Board, and noting that RCW 43.21B.320 grants the Board authority to issue a stay).

As did the superior court, we uphold the findings, conclusions, and order of the Board. The superior court's final order and judgment is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____   _____
Lawrence-Berrey, C.J.               Korsmo, J.